Good morning, may it please the court. My name is George Herides for Ryan Associates, appearing on behalf of the petitioner, Ghulam Mustafa. This is a petition for review of the Board of Immigration Appeals' decision which affirmed, without opinion, the decision of the immigration judge. Therefore, the immigration judge's decision is the final agency determination in this case, which petitioner requests this court to review for substantial evidence. The threshold issue in this case, and indeed the only issue in this case, is credibility. In the present case, the immigration judge arrived at an adverse credibility finding of petitioner's testimony. Petitioner argues that he testified unequivocally, consistently with his asylum application, and with sufficient detail regarding the persecution he suffered at the hands of the Pakistani authorities who persecuted him on account of his status of being a Muhajir and on account of his political opinion, which he expressed as a worker for the MQM party. In this case, the immigration judge relied on, for the most part, three factors for arriving at adverse credibility finding. The first factor was that she was for what she referred to as inconsistencies between petitioner's testimony and statements he allegedly made at his asylum office interview. Petitioner's trial counsel before the immigration court objected to such a finding on the grounds that the asylum officer was not made available for cross-examination and for the fact that, as it appears from the record, the asylum officer's notes were not admitted as evidence. And furthermore, petitioner argues now that with regards to those inconsistencies, he testified truthfully that he was nervous at the time of his asylum office interview, and for most of the inconsistencies cited by the judge, he could not honestly say if he did or did not, in fact, make those statements. Petitioner also testified at his hearing that with regards to several of the inconsistencies cited by the judge, he immediately clarified his statements before the asylum officer, voluntarily and without any assistance from the asylum officer. Petitioner thus argues that any inconsistencies that he allegedly made at his asylum office interview should not be used as a basis for his adverse credibility finding as the only evidence in the record with regards to such inconsistencies comes solely from petitioner's responses to the questions posed to him by the immigration judge as well as the government's attorney at that hearing. You said something about the notes weren't admitted as evidence? It does not appear so. If I am incorrect, I apologize. But it doesn't appear from the record that the asylum officer's notes were entered into the record. That is usually the case. And sometimes the Board of Immigration Appeals will remand the case to include such evidence so that they can make a clear finding as to whether or not such inconsistencies actually exist. But what could he have been relying on? He didn't have the notes. He didn't have the officer. What was he relying on? Who? The IJ. She was relying on his responses basically to the questions posed to him. You say that he relied on conflict between the notes and the testimony, but the notes are not in the record. That's correct, Your Honor. But you mean he had them but they weren't in the record? Is that what you're saying? The IJ had read the notes but he didn't put them in the record? No. The only evidence of the inconsistencies was apparently the trial counsel for the government had that in his possession but simply did not admit it as evidence or possibly had some sort of way of knowing. I don't know what the procedure is. He says to the petitioner, did you say at your asylum office interview X? And he says yes. And how do you explain that? Why did he have to have the notes? Well, to give, first of all, to be able to give the petitioner's attorney at that point in time to rebut those assertions and to scrutinize the notes and to even cross-examine the asylum officer to see, in fact, if those findings were accurate. And the petitioner testified openly and to the best of his ability that he didn't recall saying most of those, most of the. . . I thought he said he did say them but then explained why. . . Several, but for the most part, he testified it's quite possible that he did testify thus as a result of his nervousness and the fact that he was confused over many of the questions he was being asked. Let me ask you this. I'm not sure this is due to confusion. I'm not sure what it's due to. Among the other things pointed to by the IJ was that in response to initial questioning, he stated that both of his parents were born in India. That's right. And as I read that part of the transcript, he was kind of set up for that, that is to say, you're going to be one of these people if your parents came after a petition from India. And did your parents both come from India? And he says yes. In other words, the answer that's really going to help you is going to be that both of your parents are from India. He later introduces evidence that his mother was not born in India but rather was born in Pakistan. That's right. Now, I don't have any explanation as to why he changed his story. One response you can give is, well, it doesn't matter that he changed his story on that point because he could still be a member of this group even though his mother was born in India, which is clearly so. Even though his mother was born in Pakistan, he was born in Pakistan, and he is an ethnic group rather than a – the triggering is not the migration. The triggering is the membership in the ethnic group. But nonetheless, that strikes me as somebody, unless I can get a better explanation of it, somebody who gives the answer that he thinks is going to help rather than the answer that's true. Yes, Your Honor. But I would submit that he testified unequivocally on that issue, and even after submitting the certificate of domicile regarding the way his parents entered Pakistan, whether by birth or from India, he testified consistently that, to his knowledge, his mother was born in India and migrated from India to Pakistan. The IJ in this case denied to believe that the certificate of domicile was the best evidence to prove that and gave it minimal weight and even found that his father – and could not even make the specific finding that his father was indeed – had migrated from India to Pakistan. So where the IJ has not relied on that evidence, all we have as the best evidence is the petitioner's testimony here. And he testified consistently, even though submitting this documentation, which the IJ has not said is conclusive, he's maintained throughout that his parents were both indeed – had migrated from India to Pakistan. Okay. What am I supposed to do with the disparity in his testimony as to how often and how long he was supposed to report to the police station? Because there's part of his testimony that says, I was supposed to report there for two months. Maybe there's a translation difficulty. Maybe the word four shouldn't have been four, but rather every two months as an interval rather than a duration. But there's also testimony that he was supposed to do it for a much longer period, about 18 months. Is Your Honor referring to the internal consistency between one month and two months between his visits or the asylum office interview? I'm more referring to how long, the duration problem. Well, the question was before at his hearing why he had testified – why he had stated, allegedly stated at his asylum office interview that he only reported for two months, whereas he testified in court and listed in his asylum application that he reported every month or bimonthly for approximately two years. Right. And that is the duration that I'm mostly concerned about. Yes, Your Honor. And I can only submit that we must give the petitioner the benefit of the doubt regarding any inconsistencies between his asylum office interview and his testimony before the court. But he testifies in the court to two different things. Excuse me, Your Honor? He testifies in the court to two different things. Where he said monthly versus bimonthly, yes. He also testified in the court, if I read that testimony properly, that he first testifies that it was for a long time, 18 months or two years, and then later on cross he testifies that it was just for two months. No, I think, Your Honor, if you review the record on that issue, I believe he initially testified on direct that he reported every two months, I believe. But then he – on cross he said every month. The other way around, actually. Yes. But he did say that he had said otherwise, that at his asylum interview he had said just for two months. And he didn't say it's not what I meant. He said it is what I said, but I was nervous. Yes, Your Honor. In other words, it would have been a more helpful explanation if he had said, you know, I was confused. I didn't really say only for two months, I think. But he didn't say that. He said he did say it. To Petitioner's credit, he did say that he may have said that. I don't think he said may have. Or he did say that as a result of his nervousness or whatever, he uses an explanation, and that's what the court must decide then if there is an inconsistency, whether or not that's central to his claim, whether it's material. And, you know, I'm reading from page 97 of the administrative record. Yes, Your Honor. And so my – and I'm not sure this is absolutely immaterial, but as I read his testimony, it's not just his earlier asylum interview, but as I read his testimony, he's saying that he reported to that police station lines 23 through 25 at the bottom of page 97. Are you with me? 23 to 25? Lines 23 to 25. Of the administrative record 97? Yes. Yes. Are you with me? Did anything else happen when you would go and report between January of 96 and November of 98? Nothing else. And previously he's saying, I stopped in November of 98. That is to say, I stopped reporting. That's on page – on line 6 of that same page. As I read that testimony, he's saying that I reported regularly every month to the police station between January 96 and 98. Yes, Your Honor. I don't disagree with the court. He did testify that – But he later testifies that I only – that he only did it for two months. That was before the asylum officer that he stated that, not in his testimony. I'm fairly certain of that fact, Your Honor. I think you're right. And I would also like to get to the IJ's issue over a petitioner's knowledge. I apologize. It is due. You remember telling the asylum officer you reported only for two months. So the testimony refers back to that. I'm with you. I would also like to defer to the government right now and reserve whatever time I may have left to address the immigration judge's reliance on petitioner's specific knowledge or specialized knowledge of the MQM party. So, yeah, we run you over and we'll give you a minute.  May it please the Court. Joshua Bronstein for the United States Attorney General. The ambers credibility determination in this case does turn largely on the fact that the petitioner failed to prove the fact central to his claim, and that is that he is a mohajir. And as the Court has pointed out, the petitioner has serious problems in his testimony with respect to proving that underlying claim. And his failures in that regard are in line with the State Department's finding in the record at 315 that they have seen an increase in non-mohajir Pakistanis falsely asserting mohajir origins. Now, this is essentially what the immigration judge concluded, that this person was not truthful as to whether or not he was of the group he claimed to be of. And it is central to his claim that he testified that, indeed, his mother and father were both born in India. And it is not a small matter because the immigration judge made clear from the very beginning of this case that it was important for him to prove that he was a mohajir. The immigration judge asked him or told him at page 139 of the record, now, sir, proving that your parents came from India is a very, very important element of your case. Now, they didn't really have to come from India because if, for example, his mother's parents had come from India, but she was born after 48, so if his mother's parents had come from India, she would be in this group, right? I'm having trouble hearing you. I write that since his mother was born after 1948. 1954, yes. If his mother's parents had come from India, she would have been in this group. She would have had that ethnicity or social group, depending on how it's characterized. Right. So the fact that she was born there wasn't fatal to his claim. And, therefore, you have to be relying on it simply that he misstated it. He said she was born in India, and that was not true, apparently, or appears not to have been true. But the fact that she was not born in India doesn't indicate that his claim isn't true as to his status. Is that right? That's right, Your Honor. The problem with this is that he wasn't credible about where she was from. Right. But not that her actual birthplace forecloses his claim. No, Your Honor. As a matter of fact, if his father was born there, then he could have also been within that group. The problem with his testimony is he testified exactly this way. All I know is my parents, they were born in India, but they moved to Pakistan. And then later, the only evidence that he submitted were the records of domicile. And I would note that opposing counsel mentioned that the immigration judge didn't put much weight into these documents. Well, there was no – there was – the immigration judge could only credit the documents so far as to where the parents were from. What he knew was where the mother was not from, because it said she was born in the country of Pakistan. It did not say where his father was from, and therefore it could not be conclusive for his claim notwithstanding his lack of veracity on that point. Indeed, the other inconsistencies that went to the heart of the claim include the fact that – which has already been discussed, and so I won't belabor it with respect to how often and when he reported. But I will note the reasonableness of the immigration judge's finding on that score. The immigration judge said in explaining the problems in this area, and Petitioner's counsel has alluded to the fact that he said he was nervous, and the judge said reasonably, it does not seem to the court that one would remember an almost three-year period as if it were only two months, no matter how frightened one was. And we submit that that is a reasonable assessment of his testimony. There are other inconsistencies that are significant. What if he thought that some of the reasons that the IJ gave make sense and some of them make no sense in terms of the credibility finding? What do we do then? Well, the record is examined as a whole, Your Honor. I'm asking if he gives certain reasons, and some of them are not reasons for disbelieving somebody to us, but some of them are, do we then approve, do we then deny the petition or do we grant it, send it back to the IJ and say, on just these reasons would you find him not credible? The standard is that the IJ has to give specific and cogent reasons. And some of them are not cogent. It doesn't – I understand what you're saying, Your Honor. It doesn't – the standard, this Court's precedents don't address that. It doesn't say that all of his reasons or her reasons in this case must be specific and cogent. There must be specific and cogent reasons in the record as a whole supporting the finding. And here – When you judge somebody's credibility, you kind of take everything you know about them and you add it up in your head and you say, this is my – I decide he's not credible. Now, if somebody else decides that some of the things that you added up in your head should have been zero instead of one, does – how do we know he would have reached the same conclusion if he subtracted the weight from some of the things he relied on? Well, with respect to the – in this case, with respect to the particular inconsistencies the IJ cited, the Court indicated very clearly that the – primarily the major two that have been discussed were the substantial reasons on which the primary reasons, the fact that – For the way his father was born and the duration of his reporting to the police. That's right. As well as I was getting to the fact that his – his demeanor and – his demeanor and his responses with respect to his attempts to get documents. But I would note that there are inconsistencies within that. The Petitioner specifically testified when asked why he hadn't produced these documents in the first place. He said, I haven't spoken to my parents about my case. That is an unambiguous assertion, which is absolutely untrue, which he later indicates, very soon thereafter indicates. Where did he say he hadn't spoken to his parents about the case? Record at 139, Your Honor. The immigration judge said right after telling him that this is – that this is a problem, that the judge said, now, sir, proving that your parents came from India is a very, very important element of your case. Why haven't you made an effort to get their birth certificates or something? Right. I haven't spoken to my parents about my case. And also, even if I had inquired for that, it would take a long time to provide those documents. So first he says, I didn't even ask them for the documents. But then on the next page, he talks about – I'm sorry. I'm missing the next page. He later talks about how he asked his father, I should say earlier as well, when he's asked – and record at 95 – I'm sorry, record at 86, he's asked about why he didn't provide documents about his medical problems after his arrest. He says, he says, I did tell my father, and I think he could not get a letter from him, meaning he could not get a letter from the doctor. Additionally – so, I mean, these inconsistencies keep mounting and his problems keep mounting. There are two affidavits that he submitted from men he did not know. You know, you mentioned the missing page, and I don't know whose responsibility it is to compile this administrative record. There are a lot of missing pages. In fact, when you – what triggers my saying that is the page that would have told me how those letters came to be in the record and so on, it's not there. All of a sudden, I'm jumping and I'm hearing about these letters, and I don't know where they came from. I can kind of infer, but I don't know. Was it the government's responsibility to do this? Your Honor, the government – yes. I apologize for that. I didn't – I came into this case later. So notwithstanding that I'm declining to take personal responsibility, I would say that what is required is a record, as I understand it, that is substantially accurate and complete. I'm asking a different question. Whose responsibility is it to compile and get this record for us? The record is compiled, Your Honor, by a different agency from our office. So it's the government? It is the government, yes, Your Honor. It is not the – if you mean whether between the government or the Petitioners. It is the government's responsibility. I was quite jarred to read this thing, and all of a sudden, blank. And it's not just single pages. There's about five pages that are missing. I noted that as well in my preparations, but I wasn't – I found that it was not – it was not a matter of the ability to see. Did you ever – did you ever – have you seen the missing pages? No, Your Honor. Did you make any attempt to find the missing pages? I did not have time. I – and I did not – and I did not deem it essential to the question before the Court, which is whether this credibility determination was supported by substantial evidence. I would say that if I were briefing a case, I would certainly ensure that the record – there are pages missing. There's somebody in your office briefing this case who reads through and realizes there are some missing pages. That's time enough to supply the missing pages and to supplement the record. I don't disagree, Your Honor. I will – I will bring that back and, of course – Thank you. And, of course, bring it to their attention. On the – on the question of what to do if the IJ, for example, gives six reasons for finding the Petitioner not credible. And we decided that three of them are not supported by the record. And the question was, then what do we do? Does the last standard come in here? In other words, look at what's left. Does – does what's left compel a contrary conclusion? Is that where we come? That's exactly right. And I would submit that the evidence – any other evidence is far from compelling the conclusion because he couldn't prove the critical and core fact. And I don't think that the record is at all – and the immigration judge's opinion is at all assailable as to whether he could prove he was a mohajir, which was the fundamental fact of his case. Thank you very much. Thank you, Your Honor. We ran you over. Would you like a minute in rebuttal? Yes, Your Honor. Number one, I'd also like to apologize on behalf of my law firm. I believe I was the one who briefed this case, so I should have brought that to the Court's attention. There's also, I believe, significant problems with the administrative record, and I do believe it would have been helpful in this case. As – clearly from looking at this case, the IJ seems to imply that if the petitioner had submitted more corroborating documentation, he may have been able to establish his burden of proof. However, the petitioner argues that the inconsistencies cited by the IJ are not supported by substantial evidence or specific and cogent reasons. With regards to the issue of his status as a mohajir, he testified consistently and to the best of his ability and to his knowledge that he was – that his parents, in fact, were from – I mean, maybe he didn't have to bring in the birth certificate, but he was asked to bring it in. And his explanation was not it doesn't exist or there wasn't one or they don't have one. It's – I mean, it was a very strange explanation for why he couldn't come up with  I would only like to point out to the Court that that was his first, I believe, individual hearing and where he stated that. And then on the next hearing, he did testify that he asked his parents and that they weren't able to bring – He never said – when he said he asked them and he didn't get it, and it was very – for reasons he couldn't explain. Yes, Your Honor. I would only submit that – Not that they didn't have it, though. No, Your Honor. But that doesn't – that doesn't – I don't believe that suggests that the documentation is easily available, especially where he has no help other than his parents in obtaining documents and when they're in Pakistan. So he tried his best and did submit certificates of domicile, which the immigration judge did not give substantial weight to. I believe that was the reason for that. It doesn't seem that it would be very difficult. I mean, he was apparently in contact with his parents, right? Yes, Your Honor. If the problem was that they couldn't get it, that it was hard to get from the administrator, he shouldn't have said that. If the problem was they couldn't – they lost it in their house, he could have said that. If the problem was it never existed, he could have said that, but he didn't say anything, Your Honor. No, Your Honor. He did not. But his testimony alone under Lodhaus should be enough in this case to meet his burden of proof, even without – Well, his testimony about where his mother was born, you know, isn't very good testimony because how does he know where his mother was born? Well, to the best of his knowledge – he said without – for all I know, my parents were from India and they migrated to Pakistan. To the best of his knowledge. No, he said that except he didn't say for all I know. He said they came from India. I believe that was the preface to what he said. I don't want to waste the Court's time with the other issue. But I'd just like to point out that the immigration judge also improperly based her decision in large part on specialized knowledge of political events which occurred in Pakistan with regards to the MQM party. And the petitioner would only submit that such specialized knowledge is not a prerequisite for persecution based on particular membership in a group. Thank you. Thank you very much. Thank both counsel for their argument in this case. The case of Mustafa v. Ashcroft is now submitted for decision. The next case on the argument calendar is Chang v. Sonoma County. There was a change in the order of these because my list was up to three. When you're ready. Okay. Good morning, Your Honors. My name is Craig Harrison. I'm one of the pro se plaintiffs along with my wife, Marina Chang. I would like to reserve two minutes and I'll try to keep track of the time for rebuttal. Okay. As you know, there's a change of pace this morning. We've got a land use case with statute of limitations issues. Our claims approved November 2001 when the Sonoma County PRMD made its final decision on the design review rules. Let me ask you this. You've got two kinds of claims. You've got a regulatory taking claim. Right. And then you've got a lot of others that I won't. I'll just cluster as other. The equal protection. Yeah. As to the regulatory taking claim. Right. The magistrate judge ruled against you kind of belt and suspenders. Number one, that you were too late.
judges: Tg Nelson, W. Fletcher, Berzon